## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-30-JDB** |
| **STEPHANIE HAZELTON,** | |
| **Defendant.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Stephanie Hazelton ("Hazelton") to 11 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment. The 11-month incarceration recommendation is in the middle of the 8 to 14-month Guidelines range calculated by the government in this case.

### I.     INTRODUCTION

*This is battle. This is it. This is the battle.*

These were the words of the defendant, Stephanie Hazelton, as she approached the Lower West Terrace of the Capitol building on January 6, 2021. Like a commander on the battlefield, she would march forward, shouting, "More men!" and directing the rioters into the building's entranceway, where a squad of police officers in riot gear were standing guard. The rioters violently clashed with these officers for nearly the next two hours.

Hazelton, a 51-year old mother from New Jersey, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the

2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1] At approximately 2:45 p.m., Hazelton marched with other rioters towards the west front of the Capitol building. Despite seeing law enforcement's use of tear gas and pepper spray, she shouted, "Let's go! Move forward! They cannot stop us all!" When she got to the Lower West Terrace, Hazelton entered and exited the tunnel entrance several times, only to be deterred by the squad of officers in riot gear each time. When she realized the rioters could not push through, she called for reinforcements, shouting to the crowd, "We need more men," while simultaneously waving rioters towards the entrance. She repeated her instructions several times, yelling, "We need more men! We need more men! Keep going! Keep pushing! Men! We need men, not women! We need more helmets! More helmets!"

On January 7, 2021, Hazelton would write the following: "Yeah I was at [the] door the entire time from 1 to 6 and we did not make it in! That was a set up. . . . The first shot has been fired of the revolution."

The government recommends that the Court sentence Hazelton to 11 months' incarceration for her conviction of violating 18 U.S.C. § 231(a)(3), which is within the advisory Guidelines' range of 8-14 months, as calculated by the government in the plea agreement.[2] An 11-month

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] As discussed below, in the guilty plea agreement, the government and the defendant stipulated that the base offense level is 10, pursuant to USSG 2A2.4(a). Additionally, in the agreement, the government "maintains that, pursuant to USSG 2A2.4(b)(1)(A), a three-point enhancement applies because the offense involved physical contact"; however, the defendant "reserve[d] the right to challenge the application of U.S.S.G. 2A2.4(b)(1)(A) solely on the grounds that her offense did not involve physical contact." P. 3.  Thus, within the parameters of the guilty plea agreement, the guideline range is 8 to 14 months, as calculated by the government, but 0 to 6 months, as calculated

sentence reflects the gravity of Hazelton's conduct and accounts for her history and characteristics.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

In order to avoid unnecessary description, please refer to the stipulated Statement of Offense filed in this case, ECF 46 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Stephanie Hazelton's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

On January 6, 2021, Hazelton was in Washington, D.C. with members of the New Jersey Sons of Liberty to protest the certification of the 2020 presidential election and attend the rallies for then-President Trump.[3]  As shown in the figures below obtained from her cell phone, Hazelton was wearing a Sons of Liberty hat, a scarf with the image of a skull, and black tactical gloves (Figure 1). Several members of the Sons of Liberty with Hazelton were wearing tactical vests,

---

by the defendant.

[3] Historically, the Sons of Liberty was the grassroots group that was responsible for the Boston Tea Party in 1773. History.com (retrieved 5/25/2023). At present, the national Sons of Liberty website states, in part: "The Sons of Liberty (SOL) and their fight for American independence was only a mere battle in [an] eternal conquest. The fight lives on, and it is at your doorstep.  Are you willing to fight for your freedom and join this order of resistance? . . . This order of resistance will be organized in the fashion of a militarized tribe."  https://www.son-of-liberty.org/ (retrieved 5/25/23).  The group's insignia includes the image of a skull.  *Id.*

tactical gloves, and carrying riot shields (Figure 2).



*Figure 1. Still image from video on Hazelton's cell phone.*



*Figure 2. Photo from Hazelton's cell phone. Hazelton circled in red.*

    At some point after attending the protest, Hazelton began marching towards the Capitol

building. She used her cell phone to record her approach. The audio associated with the cell phone

4

video has been submitted as Exhibit 1. Hazelton can be heard making the following statements:

"They're tear gassing everybody."

"They're pepper spraying us."

"Let's go! Move forward! They can't stop us all!"

"They cannot stop hundreds of thousands of us!"

"I don't care about their tear gas."

"We're storming the Capitol right now!"

"This is battle. This is it. This is the battle."

***Breach of the Lower West Terrace Entrance***

The initial wave of rioters stormed into the Lower West Terrace tunnel at approximately 2:41 p.m. Just 6 minutes later, at approximately 2:47 p.m., Hazelton approached the Lower West Terrace tunnel entrance, which was packed with rioters pushing forward against Metropolitan Police Department ("MPD") officers in riot gear with riot shields who had positioned themselves there to prevent the rioters from entering the Capitol building. From just outside the tunnel, Hazelton turned towards the rioters outside the Capitol building and waved them up, encouraging more rioters to move into the Lower West Terrace entrance. Video from the Capitol building's closed-circuit video ("CCV") system showing Hazelton's approach and entrance into the Lower West Terrace tunnel has been submitted as Exhibit 2. Still images from that video are shown below.



*Figure 3. Still image from Exhibit 2. Hazelton outside the tunnel waving in rioters.*

At approximately 2:48 p.m., Hazelton entered the Lower West Terrace tunnel while chanting with the rioters. She moved towards the front of the crowd to confront the MPD officers. As shown in Exhibit 2, between approximately 2:48 p.m. and 2:51 p.m., while Hazelton was at the front of the mob of rioters, the rioters continued to push against the MPD officers, pulling away two shields from the MPD officers, and assaulting the MPD officers with poles and batons.



*Figure 4. Still image from Exhibit 2. Hazelton entering the tunnel chanting.*



*Figure 5. Still image from Exhibit 2. Hazelton closer to MPD officers while rioters steal shield.*



*Figure 6. Still image from Exhibit 2. Hazelton moving closer to MPD officers.*

At approximately 2:51 p.m., Hazelton backed away from the front of the throng, but stayed inside the Lower West Terrace tunnel. At approximately 2:52 p.m., Hazelton moved to the front of the crowd again to confront the MPD officers. For the next four minutes, Hazelton remained at the front of the mob as the rioters pushed forward using strobe lights to blind the MPD officers, and batons and poles to assault the MPD officers. Other rioters retreated out of the Lower West Terrace tunnel during this time, but Hazelton remained. While Hazelton was inside the tunnel, she used her cell phone to record video, which captured some of the altercations with the MPD officers.

Three of those videos have been submitted as Exhibits 3, 4, and 5. In Exhibits 3 and 4, the sound of tasers being used can be heard as well as rioters shouting, "Grab his shield!" and "Oath breakers!" The video shows how close Hazelton was to the officers and shows how physically exhausted the officers were trying to keep Hazelton and the other rioters from entering further into

the Capitol building. In Exhibit 5, Hazelton recorded rioters grabbing shields from the officers and the rioters are heard shouting, "Push them back!" and "This is our house!" At approximately the 2:00 minute mark, Hazelton retreated towards the tunnel entrance, coughing excessively from the inhalation of riot control spray. She turned the camera on herself and stated, "We're storming the Capitol. Just trying to hold the door." Just before the video concluded, she stated, "I gotta leave this to the men."

Hazelton retreated from the Lower West Terrace entrance at approximately 3:02 p.m.   The violent and physical battle for control over the Lower West Terrace entrance in the tunnel and doorway area lasted over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the Lower West Terrace entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the assault of Officer Daniel Hodges. These latter acts of violence occurred after Hazelton's exit from the tunnel area, but nevertheless, serve as important context as to the gruesome nature of the battle that existed on that day.

### Hazelton's Conduct Outside the Lower West Terrace Entrance

Hazelton's multiple charges into and out of the Lower West Terrace entrance were also captured on a video that was publicly posted to YouTube. A portion of that video has been submitted as Exhibit 6. At about the :20 second mark, Hazelton emerges from the entrance waving the rioters towards the entrance and stating, "More people. Keep going." Hazelton then shouts, "We need more men! More men!" As Hazelton encourages and waves rioters towards the entrance, rioters continue to charge into the entrance. At about the 1:30 mark, Hazelton says, "I gotta go back in," even though she is visibly struggling from inhaling riot control spray. She then repeats,

"We need more men! We need more men! Keep going! Keep pushing! Men! We need men! Not women."



*Figure 7. Still image from Exhibit 6. Hazelton waving rioters into the entrance.*

At about the 2:50 mark, the rioters are celebrating because they managed to steal two MPD riot shields from the officers inside the tunnel. At about the 3:30 mark, Hazelton shouts, "More helmets!" As can be seen in the video, during this time many of the rioters exit the tunnel and retreat away from the Capitol building, but Hazelton continues to encourage more rioters to enter, and she herself heads back into the tunnel at about the 6:00 mark.



*Figure 7. Hazelton heading back into the entrance.*

The battle in the tunnel continues for several minutes while Hazelton is in there. At about the 9:15 mark, Hazelton emerges again from the entrance. She remains outside the entrance only for about 30 seconds before rushing back in with a crowd of screaming rioters. She stays inside the tunnel with the attacking rioters for another two and half minutes, emerging again at about the 12:15 mark.

### Hazelton's Statements on Facebook

The United States obtained search warrants for Hazelton's Facebook account and cell phone. A review of the recovered material revealed that Hazelton believed that the election was fraudulent and that she planned as early as December 22, 2020, to take action in Washington, D.C. on January 6, 2021. On November 22, 2020, using the alias "Ayla Wolf," Hazelton forwarded a message from someone she claimed was a "friend who is on the inside" fraudulently claiming that then-President Trump had won the election, "but the Deep State froze the election and they're desperately trying to stuff ballots." She followed up with a message on November 22, 2020, claiming that "Dominion works to cheat," and on November 25, 2020, that "Good things will come

11

soon! As soon as Trump is confirmed."

On December 30, 2020, another Facebook user messaged Hazelton advising of the following: "DC mayor would like to close freeways and bridges th[at] block the ways [to] get into DC on Jan. 6th. Be prepared. You must MAKE IT TO CONGRESS at ALL COST where the voting is taking place and block all EXITS Even the Secret ones." Hazelton responded: "This Witch!!! We will park in the neighboring state and walk!!"

On January 2, 2021, in preparation for January 6th, she sent the following message to another Facebook user: "There are police [that] are not on our side, especially in DC, a lot of them wish they were marching w BLM in that city and hate us. We have to watch our backs."

Immediately following her actions at the Capitol on January 6th, Hazelton made statements in support of herself and the rioters, thus showing a lack of remorse. For example, the next day, on January 7, 2021, Hazelton sent the following messages via Facebook:

"[I]t was quite a battle today, sad day for America but I am glad I was there."

"The first shot has been fired of the revolution!"

"We were at the door the whole time, all the police did was attack us… they set us up, distracted us."

On January 8, 2021, Hazelton messaged, "It was a set up, Im spent, and emotional, but ok!"  Then, on January 11, 2021, she messaged, "I just need a couple days of recovery and we will [b]e back at it!!"

Between January 14 and 20, 2021, Hazelton indicated she was taking steps to cover up any evidence of her crime. On January 14, 2021, she messaged, "Trying to get all the pictures off my phone into an internal hard drive." And on January 20, 2021, she messaged, "Erase anything that lends anything to what is being said. . . . We can do damage control later." Lastly, on January 21, 2021, she tried to minimize her and the rioters' conduct: "No I never went in!" and "I never even

cam[e] close to going in, and I never saw any violence from the people."

### III.  THE CHARGES AND PLEA AGREEMENT

On November 10, 2021, a federal grand jury returned a superseding indictment charging Hazelton with six counts, including 18 U.S.C. §§ 231(a)(3) and 2 (Civil Disorder and Aiding and Abetting). On October 14, 2022, Hazelton was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.  STATUTORY PENALTIES

Hazelton now faces sentencing on 18 U.S.C. §§ 231(a)(3) and 2. As noted by the plea agreement and the Presentence Report ("PSR") issued by the U.S. Probation Office, Hazelton faces up to 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

### V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Guidelines analysis in the PSR differs slightly from Guidelines calculation in the plea agreement. The Guidelines analysis in the PSR is as follows:

Count Two: 18 U.S.C. §§ 231(a)(3) and 2

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1) | Offense involved physical contact and a dangerous weapon was possessed and its use was threatened[4] | +3 |

---

[4] Section 2A2.4(b)(1) provides "If (A) the offense involved physical contact; or (B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels." Subsections (A) and (B) are in the disjunctive. The government may prove one or the other; it need not prove both.

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(2) | Victim sustained bodily injury | +2 |
| | **Total** | **15** |
| Acceptance of responsibility (U.S.S.G. §3E1.1(a)) | | -2 |
| **Total Adjusted Offense Level:** | | **13** |

*See* PSR ¶¶ 46-57.

In the plea agreement, the parties agree that the base offense level is 10 pursuant to U.S.S.G. § 2A2.4(a). The plea agreement further provides that the defendant "understands that, pursuant to U.S.S.G. § 2A2.4(b)(1)(A), a three-point enhancement applies because the offense involved physical contact." However, the plea agreement also provides that the defendant reserves the right to challenge the application of U.S.S.G. § 2A2.4(b)(1)(A) on the ground that her offense did not involve physical contact. The plea agreement does not reference U.S.S.G. § 2A2.4(b)(2).

The government agrees with the United States Probation Office's determination that U.S.S.G. § 2A2.4(b)(1)(A) applies. Specifically, Hazelton's offense did involve physical contact regardless of whether she personally made physical contact with any of the MPD officers. Hazelton pled guilty to violating Sections 231(a)(3) and 2, and she indeed aided and abetted the other rioters and incited their actions by waving them forward and shouting: "Let's go! Move forward! They can't stop us all!"; "They cannot stop hundreds of thousands of us!"; "More people. Keep going."; "We need more men! More men!"; and "Keep going! Keep pushing! Men! We need men! Not women." In addition to her words, she herself pushed her way into the Lower West Terrace tunnel entrance. Her presence in the tunnel contributed to the massive number of rioters who pushed against and assaulted the MPD officers for nearly two hours. Thus, the three-level enhancement for physical contact applies in this case.

14

In her objections to the PSR, Hazelton contends that "To [her] counsel's knowledge, Hazelton is one of the only January 6 defendants charged with a civil disorder offense whose 'act to obstruct, impede, or interfere with any . . . law enforcement officer, 321(a)(3), consisted entirely of speech, i.e., her exhortation for 'more men' near the Lower West Terrace tunnel." Def.'s Objections, p. 2.

To date, only a modest number of defendants have been sentenced for violations of Section 231, and to date, the relatively few defendants as to whom the government has sought a Section 2A2.4(b)(10(A) enhancement have themselves physically pushed against police or grabbed police gear (a riot shield). But rioter-to-officer contact is not a prerequisite to application of the enhancement. "Physical contact" is not a defined term in the Guidelines. *Cf.* U.S.S.G. § 1B1.1, cmt., n.1 (defining "bodily injury" and "serious bodily injury"). The wording of the enhancement supports a reading that direct physical contact between the defendant and the officer is not required. *See, e.g., United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (enhancement properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd*, 230 F. App'x 457 (5th Cir. 2007). One court held that the enhancement applied to a defendant who worked in concert with a codefendant who made indirect contact with the victim. *United States v. Beltran-Higuera*, 642 F. App'x 780, 782–84 (9th Cir. 2016) (enhancement properly applied where defendant manned the fuel lines of a ship that fled from the Coast Guard for several hours, even after he saw the codefendant ship captain violently resist a USCG order to "heave to" and then ram the USCG vessel; "the district court did not clearly err in finding that [defendant] could reasonably foresee that his actions could bring about further physical contact between [codefendant] and the

officers").

In *Taliaferro*, the Court explained that

> Although no federal court has defined "physical contact" as used in [§ 2A2.4](b)(1), the meaning can be derived by examining the law of battery. While battery is defined as "intentional and wrongful physical contact with a person," *see* BLACK'S LAW DICTIONARY 152 (6th ed. 1990), it is clear that the contact between the aggressor and the victim need not be direct, but rather can result from the "indirect application of force . . . by some substance or agency placed in motion by" the aggressor.

211 F.3d at 415-16 (citing cases holding that "spitting on another person has long been held to constitute a battery").

Moreover, U.S.S.G. § 1B1.3(a)(1)(A) provides that relevant conduct includes "all acts and omissions committed, *aided, abetted, counseled, commanded, induced, procured*, or willfully caused by the defendant." (Emphasis added.) In calling for "more men, not women" and "more helmets," and repeatedly calling for more rioters to enter the tunnel and to "Keep going!  Keep pushing!", Hazelton clearly "aided, abetted, counseled, commanded, induced, [and] procured" other group members to make "physical contact" with the police.

Second, U.S.S.G. § 1B1.3(a)(1)(B) provides that relevant conduct includes "in the case of a jointly undertaken criminal activity," an "endeavor or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," and the acts of others were "(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). While in the tunnel and on the Lower West Terrace, Hazelton –who was calling other rioters forward into the tunnel -- was clearly engaged in "jointly undertaken activity" "in furtherance" of the other rioters' assault on officers in the tunnel, because everyone in the group is working together towards a common goal of forcibly overcoming the police. "Physical contact" with the police under those circumstances is "reasonably foreseeable." *Cf. United States v.*

16

*Broussard*, 882 F.3d 104, 110–11 (5th Cir. 2018) (applying § 1B1.3(a)(1)(B) to hold defendant prison guard accountable for failing to prevent other guards from assaulting inmates where defendant "admitted his knowledge of the violence committed against inmates by his squad" and "this group of deputies had committed multiple such violations in the past"). Accordingly, the Section 2A2.4(b)(1)(A) enhancement applies in this case.[5]

In addition to the three-level enhancement under U.S.S.G. § 2A2.4(b)(1)(A) for physical contact, the USPO also applied a two-level enhancement for bodily injury to a victim under U.S.S.G. § 2A2.4(b)(2). The government takes no position as to the application of this enhancement in this case and will not seek a sentence that includes its application.[6] Rather, the government will seek a sentence pursuant to the Guidelines analysis specified in the plea agreement.

The U.S. Probation Office calculated Hazelton's criminal history as category I, which is not disputed. PSR ¶ 60. Accordingly, based on the government's calculation of Hazelton's total adjusted offense level, after acceptance of responsibility, at 11, Hazelton's Guidelines imprisonment range is 8 to 14 months' imprisonment.   The plea agreement contains an Estimated

---

[5] In her objections to the PSR, Hazelton also complains that she was "protesting" and it was the police who assaulted her: "After exiting the Lower West Terrance tunnel, Hazelton was struck by a police officer wielding a nightstick. At the time, Hazelton was in a crouching position with her hands laced above her head so as to protect herself in the chaotic scene outside the tunnel. The officer's baton landed on Hazelton's hands, crushing one of her fingers. The defendant's mangled finger required surgery." Def.'s Objections, p. 1. While Hazelton's phone included photos of an injury to her finger, the government has no evidence of how, or even when, Hazelton's finger was injured. But even if the injury was inflicted by law enforcement in its effort to protect the members of Congress and the Capitol building from violent assault and breach, that physical conduct was entirely lawful and could not have been unexpected.

[6] In support of this enhancement, the Probation Office cites injuries to certain police officers in the tunnel.  PSR ¶ 126.  However, the government's evidence shows that these officers were injured after Hazelton left the tunnel.

Guidelines Range that mirrors this calculation ("In accordance with the above, the Estimate Offense level will be at least 8 or 11 depending upon the application of the contested enhancement").

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Hazelton's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. She was at one of the most violent sections of the Capitol on January 6th, and, indeed, encouraged that violence. The nature and circumstances of Hazelton's offense were of the utmost seriousness, and fully support the government's recommended sentence of 11 months' imprisonment.

### B.  The History and Characteristics of the Defendant

Hazelton is a 51-year-old mother from New Jersey. PSR ¶ 65. She was raised by her maternal great-grandparents. PSR ¶ 66. She is married to a sales manager for a home improvement company who frequently travels for work. PSR ¶ 68. They have two boys together, ages 11 and 12, who both have various medical conditions and are homeschooled by Hazelton in addition to being enrolled in various programs and classes. PSR ¶ 69. According to Hazelton, she is the children's primary caregiver and is present for most of their programs due to their need for monitoring and guidance. PSR ¶ 69.

Hazelton reported a history of alcohol use but refused to disclose to the U.S. Probation

Office any additional substance abuse history under advice of counsel. PSR ¶ 80.

Hazelton's only criminal history consists of an arrest in 2008 for a fugitive from justice charge, which was dismissed on February 1, 2008.

Hazelton's history and characteristics weigh in favor of a custodial sentence. While Hazelton's status as a homemaker and caretaker of her children is a factor that may warrant a recommendation of a sentence at the low end of the Guidelines range, it does not warrant a non-custodial sentence. *See*, *e.g.*, *United States v. Rau*, No. 21-cr-467 (JEB) (sentencing misdemeanor January 6 defendant for a Section 4105(e)(2)(D) conviction to 45 days' incarceration where defendant was caregiver to three children under six); *United States v. Heinl*, No. 21-cr-370 (EGS) (sentencing misdemeanor January 6 defendant for Section 4105(e)(2)(G) conviction to 14-days intermittent confinement where children could stay with ex-husband and biological father). Hazelton is married to the children's father who, although he travels for work sometimes, does live in the household.   Moreover, Hazelton has the financial resources to arrange childcare. PSR ¶¶ 86, 92.

The government is cognizant of Hazelton's family circumstances, and sympathizes with the defendant and her family. But sadly, crime carries consequences. That fact cannot be a carte blanche to escape the consequences of criminal conduct, past or future. As courts have repeatedly observed, it is often the families of the defendant who bear the collateral consequences of the defendant's behavior – but that fact does not ordinarily warrant relief from the proscribed sentence. *See, e.g.,* U.S.S.G. § 5H1.6 ("In sentencing a defendant … family ties and responsibilities are not ordinarily relevant in determining whether a departure is warranted"). Moreover, her family circumstances also did not stop or prevent her involvement in the riot in the first place. Finally, the government's issued plea offer to the above charge, as opposed to Obstruction (18 U.S.C. §

1512(c)(2)), took into consideration the defendant's individualized circumstances. In other words, the benefit was built into the bargain.

     **C.**    **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Hazelton's criminal conduct, which included inciting the rioters, waving them forward, directing them into the Lower West Terrace tunnel, calling for battle, and she herself running in and out of the tunnel three times to confront MPD officers risking their lives to protect members of Congress and the Capitol building, was the epitome of disrespect for the law.

Hazelton went to Washington, D.C. dressed for violence, and she encouraged violence and energized rioters at the scene of some of the worst fighting that day. She came for "revolution" and participated in an assault on democracy that resulted death, injury, and destruction. A sentence of incarceration in the guideline range properly reflects the seriousness of that conduct.

     **D.**    **The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

_____

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a lengthy term of incarceration.

First, although Hazelton has a criminal history category of I, her words leading up to January 6th, her conduct on January 6th, and her words following January 6th, show a clear premeditated intent to commit the crime for which she has been convicted. She was not a mere passerby or protester who just followed a crowd through an open door. Rather, shortly after the 2020 election, Hazelton subscribed to the false belief that the election was fraudulent and wanted to be part of the movement that went to Washington, D.C. to protest the certification of the vote. As she approached the Capitol building, she hyped herself up as she prepared for "battle." In other words, Hazelton knew before she even got to the Capitol building that she was not there to participate in some peaceful protest. January 6th was always going to be a "battle," and she would play the role of a commander on the battlefield, directing "men" (not women) with "helmets" into the Lower West Terrace entrance – where arguably the most violent clash with law enforcement officers would occur that day.

Second, after January 6th, Hazelton did not express remorse for actions, but rather minimized her conduct and the conduct of the other violent rioters around her and declared that she was part of a setup. She further exclaimed, "The first shot has been fired of the revolution," seemingly expressing pride in her conduct. Her rhetoric and conduct demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of civil disorder.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The best comparison for Hazelton is that of three other individuals with minimal criminal histories who were convicted of Civil Disorder under 18 U.S.C. § 231(a)(3) for their unlawful conduct on January 6, 2021: Moises Romero, Nolan Cooke, and Robert Fairchild, Jr. In each case, the defendant pleaded guilty to one count of 18 U.S.C. § 231(a)(3) and each committed conduct sufficient for application of the three-level § 2A2.4(b)(1)(a) enhancement for an offense involving physical contact.

Nolan Cooke helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol building. *See United States v. Cooke*, No. 22-cr-52 (RCL), ECF No. 48 at ¶ 9. Cooke later bragged that he was one of the first to break through the barricade. Like Hazelton, Cooke encouraged other rioters to overrun the police line, yelling obscenities along the way. *Id.* at ¶ 10. Once the rioters had broken through the barricade, Cooke rushed to the Capitol steps and then up to the building itself. *Id.* at ¶ 11. Cooke used a flagpole bearing an American flag to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass." *Id.* Cooke eventually left the restricted area without entering the building. *Id.* at ¶ 12. Afterwards, Cooke was cooperative with law enforcement officers when they interviewed

---

other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

him. *Id.* at ¶ 14. Judge Lamberth sentenced Cooke to a year and a day of imprisonment, in the middle of Cooke's 8-14 month guidelines range. *Id.*, ECF No. 60.

Moises Romero was one of the first few rioters to overrun the Capitol Police officers defending the Senate Wing Door at 2:48 p.m. *See United States v. Romero*, No. 21-cr-677 (TSC), ECF No. 23 at ¶ 11. Like Hazelton, Romero had no prior criminal history. *See id.*, ECF No. 29 at 37. He brought eye protection and a respirator; like Hazelton who wore tactical gloves and acknowledged she was entering a "battle," anticipating violence before he went to D.C. *Id.* at ¶ 36. Romero's conduct was aggravated because he pushed through a police line at the Lower West Terrace, grabbed a police officer's riot shield as he breached the Senate Wing Door, and entered a senator's private office during his time in the building. *Id.* at ¶¶ 36-37. Romero took multiple videos of his unlawful presence in the Capitol and put together a composite video that he proudly disseminated through social media. Id. at ¶ 37. Romero then tried to enter the Capitol again. *Id.* at 40. To reflect the gravity of Romero's conduct and promote the goal of general deterrence, Judge Chutkan sentenced him to a year and a day of imprisonment and 12 months of supervised release. *Id.*, ECF No. 36.

Robert Fairchild also was convicted of Civil Disorder and faced a Guidelines range of 8 to 14 months of imprisonment. *See United States v. Fairchild*, No. 21-cr-35 (TFH), ECF No. 34. Fairchild stood at the front line of rioters who broke through a police barricade on the west side of the Capitol building. *Id.*, ECF No. 35 at ¶¶ 9-10. He made multiple attempts to wrest the metal barriers away from a line of law enforcement officers, eventually assisting other rioters carrying at least two barriers away from the line. *Id.* at ¶ 10. Fairchild then entered the Capitol building through the Senate Wing Door, without force, at approximately 3:10 p.m. and walked through the building for around nine minutes. *Id.* at ¶ 11. Recognizing Fairchild's status as the first defendant

to appear before him to express remorse for what January 6 did to the victims, rather than himself, and due to Fairchild's military service and PTSD, Judge Hogan sentenced him to six months of incarceration and no supervised release. *See id.*, ECF No. 46.

Regardless, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." Id. at 1095.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[10] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Hazelton must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Hazelton played in the riot on January 6.[11] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Hazelton's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 121.

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 11 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   _____
CHRISTOPHER D. AMORE
Assistant United States Attorney
Capitol Siege Section Detailee
N.Y. Bar No. 5032883
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20001
Christopher.Amore@usdoj.gov

28