**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 21-cr-30-JDB |
| | ) |
| STEPHANIE HAZELTON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**SENTENCING MEMORANDUM OF STEPHANIE HAZELTON**

Stephanie Hazelton stood outside the Lower West Terrace tunnel of the Capitol Building on January 6, 2021 and shouted words of encouragement to rioters. She deeply regrets her conduct and apologizes to the law enforcement officers who struggled in that chaotic scene. At sentencing, Hazelton will express heartfelt remorse for her involvement in the events at the Capitol that day and will vow never again to interfere with officers during a riot, the offense to which she pleaded guilty. 18 U.S.C. § 231(a)(3).

But while Hazelton's misconduct was hardly unique that day, the charges she faced were unusual when one compares her actions with those of other January 6 defendants. It is undisputed that Hazelton did not enter the Capitol Building. That she did not make physical contact with any officer and did not destroy or attempt to destroy property is also undisputed. In fact, as she crouched in a defensive posture outside the tunnel with her hands laced over her head, an officer brought a baton down on her head, crushing one of her fingers, which required reconstructive surgery. Yet Hazelton was charged not only with a felony civil disorder offense but also with obstruction of an official proceeding under § 1512(c)(2)—a high-level offense generally reserved for protesters who entered the building. An examination of § 231(a)(3)

1

charges in the January 6 cases shows that, unlike virtually every other rioter charged with a civil disorder offense, Hazelton did not attempt to move bike racks or fencing, did not lend her body and weight to any "heave-ho" between protesters and police, and did not push officers back from their positions.  Hazelton appears to be the sole defendant charged for her words and physical presence alone.  And while her encouraging speech was blameworthy, the law recognizes a distinction between such speech and acts of physical violence.  As a result, the Presentence Report has mistakenly added five levels to Hazelton's total offense level.  Correctly calculated, her total offense level is eight, yielding a Guidelines range of 0-6 months' incarceration.

Hazelton, 51, is the primary caregiver to two children who are 11 and 12 years old.  They are homeschooled.  Both have special needs.  One child has autism and the other a pediatric autoimmune neuropsychiatric disorder similar to autism.  Hazelton's day revolves around her children's considerable needs, as the letters submitted on her behalf attest.  The father cannot replace Hazelton in this critical caregiving role.

Given that Hazelton's conduct is less severe than nearly every other defendant charged under § 231(a)(3)—indeed, less severe than the conduct of dozens of misdemeanants who entered the Capitol—and in light of her role as a primary caregiver to special needs children, she submits that her felony conviction, coupled with a sentence of three months' home detention, 24 months' probation, and a significant fine would be sufficient but not greater than necessary to comply with the purposes of § 3553(a).

**Factual background**

### A.    Hazelton's background, family, employment history, and character

Born on November 3, 1971 in Trenton, New Jersey to immigrant parents, Hazelton was abandoned by her father and raised in a religious commune, where she had no electricity, heat,

plumbing or phones.  She often went hungry.  Eventually, responsibility for her upbringing was assumed by her great-grandparents from Sicily.  Hazelton understands that her mother struggled with mental illness throughout her life and ultimately ended up committed to a psychiatric hospital.  While attending Catholic school, Hazelton worked multiple jobs to make ends meet for her great-grandparents who needed extra care.

 Hazelton enrolled at Rider University, though she left college after having her first child in 1992.  Her relationship with the child's father having deteriorated, Hazelton relocated around the country, switching between odd jobs over the course of years.  In 2009, Hazelton met her current husband, Jeff, with whom she had two sons, 12-year-old Knightley and 11-year-old Kingston.  Knightley has autism; Kingston suffers from a pediatric autoimmune neuropsychiatric disorder similar to autism.  Both attend private homeschooling classes at a local church and learning cooperative.  Hazelton co-teaches at the cooperative.

Virtually all of Hazelton's time is dedicated to serving the special needs of her children. They need to be guided every day: to get dressed, to eat their breakfast, to continue their education at the cooperative.  Hazelton brings them to the cooperative every week and stays there with them during courses.  The children cannot be left alone in class without her, due to behavioral issues.  Hazelton also brings her sons to their tutor, as well as to their therapy classes.

Jeff simply cannot assume these responsibilities.  A sales manager, Jeff is out of town for work most weeks on the road.  If he were to attempt to assume responsibility for the children, he would certainly lose his job.  That would mean the family's primary source of income would be terminated.  The Hazeltons would then be unable to carry their mortgage payments on the home.

As the letters submitted on her behalf show, Hazelton's kind, caring, and selfless nature extends beyond her own home.  For example, a friend of many years writes,

3

> I've witnessed so many good things [Hazelton] has done not only for her family,
> myself but also for others. She has taken my daughter under her wing and
> made a place in her family where she could come and spend time with her
> children and learn how to care for her animals. Stephanie attends to both night
> and day. Stephanie gave my daughter a sense of purpose and belonging
> when she needed it. My daughter adores Stephanie's family and I trust my
> children with her gentle nature, always.

Exh. 1, Hazelton Ltrs., p. 1.

> In a similar vein, another friend tells the Court,

> I have been able to count on Stephanie to help me with my children, when I have needed
> groceries due to illness, or just to lend an ear when I need to talk. Stephanie volunteers at
> our homeschool co-op as a teacher and is passionate, smart and organized; honestly one
> of the best teachers that I have ever witnessed. I don't leave my kids with many as I have
> an immune-compromised child, yet I have left my children in Stephanie's care on
> numerous occasions. When our family fell ill with Covid in September 2021 Stephanie
> was the first one there with groceries and offering any help she could. I have witnessed
> Stephanie helping others countless times as well!

Exh. 1, p. 3.

> As indicated, Hazelton teaches at the cooperative where her own children are educated.

Parents marvel at her generosity in volunteering her time for others' children:

> As one of the teachers at our homeschool co-op, Stephanie volunteers her personal time
> to prepare meaningful lessons for her students. Our children feel safe with Stephanie and
> love learning what she teaches. She is very well versed in several different subjects and
> generously shares her knowledge with others. Stephanie is kind, patient and supportive
> with all of the children, which I get to witness as a helper in the classroom.

Exh. 1, p. 4.

> And Hazelton's generosity of spirit reaches beyond the classroom.  An agricultural

professional from the American Samoa tells the Court about more far-flung forms of assistance.

Hazelton, he writes,

> assisted me in providing vitamins to vulnerable children in my country of Samoa to help
> with their health status in 2019.  She even went so far as to organize with a medical
> professional in the US who assisted with our efforts to help sick children and ensure they
> were getting adequate and critically required healthcare and the correct medications.

Exh. 1, p. 8.

In another example of this character trait, Hazelton's husband Jeff tells of the recent

episode where,

> Stephanie learned that an acquaintance who was in an abusive relationship was
> abandoned by her husband. [The friend being] [p]enniless and alone with her child being
> severely autistic, Stephanie stepped in to provide her with food and clothing and helped
> her find a place to stay, gave financial assistance from our grocery money. She even
> identified an attorney to help the woman protect her rights.

Exh. 1, p. 20.

Multiple writers also note Hazelton's love for, and kindness to, animals.  Exh. 1, pp. 15,

17.

During the pandemic, Hazelton became more politically active.  She attended political

rallies in her home State of New Jersey.  But, as a friend of Hazelton's tells the Court,

> During the rallies, Stephanie was adamant that we should always remain peaceful and
> professional. Stephanie would kindly ask people to not hold up signs with any obscenities
> or anything considered rude. She asked people not to chant anything unkind. She asked
> that the American flag always be displayed in a respectful manner. Stephanie often
> thanked the police officers, military, and our elected officials. Sometimes I would see the
> NJPD officers chatting with her in what appeared to be a friendly exchange.

Exh. 1, p. 10; *see also* p. 22.

**B.      The plea agreement, conviction and presentence investigation report**

As indicated, Hazelton pleaded guilty to interfering with law enforcement officers during

a civil disorder under § 231(a)(3).

In her plea agreement, the parties agreed that a base offense level of 10 applied under

U.S.S.G. §2A2.4(a).  ECF No. 45, p. 3.  The parties noted their disagreement over whether the

offense involved physical contact and thus over whether a three-level enhancement applied under

U.S.S.G. §2A2.4(b)(1)(A).  *Id.*

Hazelton's statement of the offense stipulated the following facts, among others:

      1.      On January 6, 2021, at approximately 2:45 p.m., Hazelton approached the west front of the Capitol Building where a large group of rioters had formed. Hazelton used her cell phone to record her approach to the Capitol Building. As she approached, she made the following statements:

> o  "They're tear gassing everybody."
> o  "They're pepper spraying us."
> o  "Let's go! Move forward! They cannot stop us all!"
> o  "I don't care about their tear gas."
> o  "We're storming the Capitol right now!"
> o  "This is battle. This is it. This is the battle."

ECF No. 46, p. 4.

      2.      Between 2:48 p.m. and approximately 3:02 p.m., Hazelton entered and remained in the Lower West Terrace tunnel as other rioters engaged with law enforcement officers.  ECF No. 46, pp. 4-5.

      3.      While Hazelton was outside the tunnel, she yelled out to the rioters, "We need more men," while simultaneously waving the rioters towards the Lower West Terrace entrance. She repeated that instruction several times, yelling, "We need more men! We need more men! Keep going! Keep pushing, men! We need men, not women!" She then yelled, "We need more helmets! More helmets!" ECF No. 46, p. 5.

      4.      Hazelton again entered the tunnel for approximately four more minutes.  ECF No. 46, p. 5.

      5.      On January 7, 2021, Hazelton sent the following text messages describing her presence at the Capitol Building. She wrote, "Yeah I was at [the] door the entire time from 1 to 6 and we did not make it in! That was a set up." In the same text exchange, she also wrote, "The first shot has been fired of the revolution." ECF No. 46, p. 5.

Based on those facts, the PSR added the three-level Specific Offense Characteristic for an offense involving physical contact, U.S.S.G. §2A2.4(b)(1), and the two-level Specific Offense Characteristic for an offense involving a victim who sustained bodily injury under U.S.S.G. §2A2.4(b)(2).  PSR, ¶¶ 49-50.  These enhancements are mistaken.

First, there is no evidence to show—and the PSR cites no evidence showing—that Hazelton herself made physical contact with any law enforcement officer or caused bodily injury to any victim.

Second, neither the stipulated facts nor any evidence shows that Hazelton may be held responsible for another person's offense causing physical contact or bodily injury through aiding and abetting liability.  It is axiomatic that accomplice liability presupposes the existence of a separate individual who is directly responsible for the specific crime at issue, i.e., the principal. *Rosemond v. United States*, 572 U.S. 65, 70 (2014).  One who aids or abets the principal is punishable as a principal under 18 U.S.C. § 2.  *Id.*  A person aids or abets a crime "if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Id.* "An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged. . ." *Id.* at 76. "To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Id.* (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

Here, the government has identified no evidence linking Hazelton's "We need more men" remark to any identifiable physical touching of a law enforcement officer by any particular protester. The PSR appears to assume without evidence that some such connection exists. But it

7

must be established with evidence.  The Statement of Offense does not stipulate facts supporting

a finding that Hazelton aided and abetted a principal's physical contact with a law enforcement

officer.  ECF No. 46.  There is no evidence showing that Hazelton intended her remark to incite

physical contact as opposed to confrontation or protest through physical proximity alone.

Instead, the PSR appears to reason as follows: The Criminal Complaint references a

certain video depicting Hazelton's presence at the Lower West Terrace tunnel.  PSR, ¶ 36.  The

video apparently shows that approximately five minutes after Hazelton leaves the tunnel area,

"an officer is seen walking back from the crowd to the tunnel." *Id*., ¶ 41.  And, the PSR

continues, an article posted online by the *Washington Post* reported on January 14, 2021 that, at

some unspecified point, "the crowd pulled this same officer down to the ground and dragged him

on his stomach down a set of steps." *Id.*  Both that officer and a colleague were then assaulted,

according to the newspaper.  One of them, the Post reported, suffered a heart attack.  *Id.*

There are several problems with increasing Hazelton's offense level on this basis: (1)

according to the PSR itself, Hazelton left the tunnel at least five minutes before these apparent

assaults and no evidence connects her prior statements (or intent) to them; (2) the *Post* article is

not evidence; and (3) the government has produced no evidence establishing that Hazelton aided

and abetted the assaults under the *Rosemond* standard.  In addition, none of Hazelton's words

evinces an intent to facilitate the use of a dangerous weapon.

Section 2A2.4(b)(2) does not apply for several reasons.  First, the government has never

suggested at any point in its conversations with Hazelton that this enhancement applies.  Second,

no evidence shows that Hazelton directly caused bodily injury to anyone on January 6.  Third, no

evidence supports a finding that "the actions of [Hazelton] . . . [otherwise] led to the injuries of at

least one law enforcement officer." PSR, ¶ 50. The evidence cited by the PSR appears to derive

8

from the Criminal Complaint allegation and *Post* article mentioned above.  But, as Hazelton previously explained: (1) according to the PSR itself, Hazelton left the tunnel at least five minutes before these apparent assaults and no evidence connects her prior statements (or intent) to the later-in-time assaults; (2) the *Post* article is not evidence; and (3) the government has produced no evidence establishing that Hazelton aided and abetted the assaults. Fourth, even if Hazelton's statements indirectly "led" to these injuries, nothing about her statements indicates she specifically intended that others would cause such injuries, as opposed to merely confronting or moving closer to law enforcement.  Therefore, the enhancement cannot apply under an aiding and abetting theory.  *Rosemond*, 572 U.S. at 76 ("An intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to the specific and entire crime charged. . .").

The unprecedently expansive aiding and abetting theory on which the PSR relies would imply that every jeering person in the mob aided and abetted every offense committed by any participant in the mob—without any proof that the principal offenders even heard the alleged accomplice.  No court has so held in the January 6 cases, or apparently in any other case.

In sum, then, Hazelton's total offense level is 8, which, in Criminal History Category I yields a Guidelines range of 0-6 months' incarceration.  U.S.S.G. Ch. 5.

**Argument**

**I.     Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under

the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

## II.    The § 3553(a) factors favor a significant downward variance

### A.    The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))

A number of considerations under § 3553(a)(1) merit a significant downward variance[1] in Hazelton's case: (1) her facts are considerably less severe than virtually every other January 6 case involving a § 231(a)(3) conviction; (2) the deleterious effects on Hazelton's children; (3) Hazelton's history of good deeds; (4) community and family support; (5) Hazelton's first-time offender status; and (6) Hazelton's remorse.

#### 1.    Nearly all the § 231(a)(3) cases are more severe than Hazelton's

Hazelton was charged under § 231(a)(3) though she did not make physical contact with an officer, did not attempt to move bike racks or fencing, did not lend her body and weight to any "heave-ho" between protesters and police, and did not push officers back from their positions.  The actus rei here appear to encompass the defendant's speech and presence alone.

---

[1] If Hazelton is correct that her Guidelines range is 0-6 months' incarceration, the Court would not need to downwardly vary to arrive at a sentence of three months' home detention, 24 months' probation, and a significant fine.  Her references to a "downward variance" have been included in case the Court's Guidelines calculation goes beyond 0-6 months' incarceration.

That distinguishes her case from virtually every other January 6 defendant charged under §

231(a)(3):

| § 231(a)(3) 1/6 Defendant | Case No. | Violent criminal conduct |
|---|---|---|
| Adams | 21-cr-84 | Pushed police officers against a wall |
| Alam | 21-cr-190 | Threw punches at law enforcement |
| Antonio | 21-cr-497 | Threw objects at police |
| Ballard | 21-mj-529 | Threw tabletop at police |
| Bingham | 21-mj-430 | Threw punch at officer |
| Brock | 21-mj-527 | Striking police with rod |
| Brockhoff | 21-mj-444 | Shooting fire extinguisher at police |
| Brown | 21-mj-565 | Spraying pepper spray in officers' faces |
| Brown | 21-mj-498 | Pushing and punching police |
| Buteau | 21-mj-487 | Throwing hard objects at police |
| Byerly | 21-mj-500 | Tasing police |
| Caldwell | 21-cr-181 | Spraying pepper spray at police |
| Cua | 2021 U.S. Dist. LEXIS 44293 | Shoving officer |
| Coffee | 21-cr-327 | Hitting officer with crutch |
| Copeland | 21-mj-403 | Shoving and grabbing officer |
| Council | 21-mj-08 | Shoving officers |

| | | |
|---|---|---|
| Dasilva | 21-mj-520 | Grabbing, pushing and pulling police |
| Davis | 21-mj-536 | Shoving police |
| DeGrave | 2021 U.S. Dist. LEXIS 92102 | "Coming to blows" with police |
| Egtvedt | 21-cr-177 | Throwing punches at police |
| Fairlamb | 21-cr-120 | Shoving and punching police |
| Fitzsimons | 21-cr-158 | Punching officers |
| Foy | 2021 U.S. Dist. LEXIS 123953 | Swinging hockey stick and throwing objects at police |
| Galetto | 21-mj-386 | Knocking officer to the ground |
| Hayah | 21-mj-577 | Shoving officers |
| Jenkins | 21-cr-245 | Throwing pole at officers |
| Johnson | 21-cr-332 | Knocking over officer who falls unconscious |
| Judd | 21-cr-40 | Throwing object on fire at police |
| Klein | 21-cr-236 | Striking officers with shield |
| Lang | 21-cr-53 | Thrusting a bat and shield at officers |

| | | |
|---|---|---|
| Languerand | 21-cr-353 | Throwing garbage cans at officers |
| Lazar | 21-mj-533 | Spraying chemicals at police |
| Mackrell | 21-cr-276 | Striking multiple officers |
| McCaughey III | 21-cr-40 | Striking multiple officers |
| McGrew | 21-cr-398 | Striking officer |

| McHugh | 21-cr-453 | Macing officers |
|--------|-----------|-----------------|
| McKellop | 21-cr-268 | Macing officers |
| Mellis | 21-cr-206 | Striking officers with a stick |
| Middleton | 21-cr-367 | Poking officers in the face |
| Miller | 21-cr-75 | Spraying officers with pepper spray |
| Morss | 21-cr-40 | Striking officer with shield |
| Mullins | 21-cr-35 | Assaulting officer |
| Nichols | 21-cr-117 | Spraying pepper spray at officers |
| Owens | 21-cr-286 | Striking officer in the head with skateboard |
| Padilla | 21-cr-214 | Ramming cop with metal sign |
| Palmer | 21-cr-328 | Spraying fire extinguisher in face of officer |
| Pezzola | 21-cr-52 | Smashing large window of Congress, a crime of violence |
| Quaglin | 21-cr-40 | Striking multiple officers |
| Randolph | 21-cr-332 | Assaulting officer |
| Sabol | 21-cr-35 | Striking officer |
| Sandlin | 21-cr-88 | Attempting to rip helmet off officer |
| Sandford | 21-cr-86 | Throws fire extinguisher at officers |
| Sargent | 21-cr-258 | Throwing punches at officers |
| Schwartz | 21-cr-178 | Bear spraying officers |

| Shively | 21-cr-151 | Assaulting officers |
|---------|-----------|---------------------|
| Sibick | 21-cr-291 | Attempting to take officer's gun, while threatening to kill him |
| Stager | 21-cr-35 | Smashing officer with flag pole |
| Stevens | 21-cr-40 | Striking officer with shield |
| Warnagris | 21-cr-382 | Shoving officer |
| Webster | 21-cr-208 | Striking officer with flag pole |
| Woods | 21-cr-476 | Tripping officer and pushing her to ground |

That Hazelton's interfering acts did not involve physical violence is a powerful ground for a downward variance.

### 2.    The deleterious effect on Hazelton's special needs children

While a Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant in determining whether a *departure* may be warranted," U.S.S.G. §5H1.6, (emphasis added), it is still proper to downwardly vary on that basis and, in any case, the Court is empowered to disagree with the Guidelines on policy grounds. *E.g.*, *United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (downwardly varying from 46-57 month guideline range to 12 months in prison and 12 months of home confinement based on defendant's role as a caretaker for eight-year-old son and elderly parents).  After *Gall*, the sentencing court does not need to find the defendant's family responsibilities "extraordinary" in order to disregard the policy of U.S.S.G. §5H1.6.  *E.g.*, *United States v. Warfield*, 283 Fed. App'x 234, 235 (5th Cir. June 20, 2008).  As in every discretionary sentencing decision, the standard is reasonableness.

Here, the deleterious effect on Hazelton's special needs children from a sentence of incarceration would be profound.  As indicated, the young children who have autism need to be guided every day: to get dressed, to eat their breakfast, to continue their education at the cooperative.  Hazelton brings them to the cooperative every week and stays there with them during courses.  The children cannot be left alone in class without her, due to behavioral issues. Hazelton brings her sons to their tutor, as well as to their therapy classes.  Jeff, the husband, simply cannot assume these responsibilities.  A sales manager, Jeff is out of town for work most weeks on the road.  If he were to attempt to assume responsibility for the children, he would certainly lose his job.  That would mean the family's primary source of income would be terminated.  The Hazeltons would then be unable to carry their mortgage payments on the home.

The Court has sentencing options available that would both deter Hazelton and avoid doing extreme harm to her family.  These considerations powerfully argue for a downward variance.  *Munoz- Nava*, 524 F.3d at 1137.

### 3.     Hazelton's history of good deeds

After *Booker-Gall-Kimbrough*, the case law is clear that good works, both exceptional and otherwise, whether performed pre-indictment or post-indictment, are a valid basis for a downward variance. *See Tomko*, 562 F.3d at 560 (3d Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008).

As outlined above, Hazelton's life has been marked by her acts of nurturing and kindness, not only to her family but also to friends, strangers and animals.  That is a basis for a downward variance.

### 4.     Community and family support

The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance. *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

As indicated above and in her letters in support, Hazelton is part of a loving family that is capable of financially and emotionally supporting her.  That is a ground for downwardly varying.

### 5.     First-time offender status and atypical conduct

The fact that Hazelton is a first-time offender, and that the offense conduct is atypical for her, is an appropriate basis for a downward variance.  *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month range to below the calculated Guidelines range was reasonable and permissibly took into account the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142, 1143 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Hazelton's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis.  *See United*

*States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

### 6.    Hazelton's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. Indeed, district courts may vary downward based on remorse even where the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 does not apply because the defendant exercised his right to trial. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Hazelton deeply regrets her decision to interfere with law enforcement officers on January 6. She regrets calling on rioters to enter the tunnel. To the extent her actions at the scene contributed to the injury and distress of outnumbered law enforcement officers, she offers them her sincere apology. Hazelton will personally demonstrate remorse at sentencing in her allocution and will leave little doubt about her feelings.

### B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

Although Hazelton has been convicted of a felony offense, it must be borne in mind that her offense conduct is similar to that of many January 6 misdemeanants and in some cases is less severe. After all, unlike hundreds of January 6 defendants, Hazelton did not enter the Capitol Building and act in a disorderly manner there:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Danielle Doyle, 21cr324 | Parading in Capitol | 2 mos. probation | Entered the Capitol Building by climbing through broken window, remained inside for about 30 minutes. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |

| Jenny Cudd, 21cr68 | Parading in Capitol, Entering Restricted Area | 2 mos. probation | Entered the Capitol Building. |
|---|---|---|---|
| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still |

| | | | |
|---|---|---|---|
| | | | inside" and "Patriots won't go down without a fight." |
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |

| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |
|---|---|---|---|
| Andrew Ericson, 21cr506 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's conference room, stealing a possession of the Speaker's. |
| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Rachael Pert, Dana Winn, 21cr139 | Entering a restricted area | 12 mos. probation | Entered the Capitol Building, Pert later saying, "We were trying to storm them to stop the vote . . ." |

| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |
| --- | --- | --- | --- |

Sentencing Hazelton to a term of incarceration when dozens or perhaps hundreds of protesters who received probationary sentences entered the Capitol Building and engaged in disorderly conduct there would create unwarranted sentence disparities.

## C.      The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

For spontaneous actions that occurred over the span of an afternoon, Hazelton's criminal record now includes a felony conviction, though she committed no acts of violence or property destruction.  As a result, Hazelton will struggle to secure gainful employment.  Moreover, she has incurred considerable public shame and disgrace through the intense media focus on her case.  The government has adduced no evidence to suggest that these penalties, coupled with home detention, probation and a fine, are insufficient to achieve specific deterrence in a 51-year-old mother of special needs children with no criminal history, much less that over a year of incarceration is "not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

Hazelton did not enter the Capitol Building.  She assaulted no one and destroyed no property.  She had no preconceived plan to riot.  The crowd turned into a mob which then led to a riot in the shadow of the Capitol Building.  This had never happened before in its long history.  Like hundreds of others in the area, she engaged in criminal conduct in an unprecedented scene of chaos.  Hazelton has no history of political extremism.  This case has already turned

Hazelton's life upside down.  The government's suggestion that these heavy blows are insufficient to deter the one-time, situational crime Hazelton committed is nonsense.

**Conclusion**

For all the foregoing reasons, Hazelton respectfully requests a sentence not greater than three months' home detention, 24 months' probation, and a significant fine.

Dated: May 26, 2023                     Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Stephanie Hazelton*

**<u>Certificate of Service</u>**

I hereby certify that on the 26th day of May, 2023, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Stephanie Hazelton*